PREET BHARARA
United States Attorney for the
Southern District of New York
By:  MATTHEW L. SCHWARTZ
     PAUL M. MONTELEONI
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone:  (212) 637-1945/2219
Facsimile:  (212) 637-0421
E-mail:     matthew.schwartz@usdoj.gov
            paul.monteleoni@usdoj.gov



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

               Plaintiff,

    - against -

JOANN CRUPI,
    a/k/a "Jodi,"
JUDITH G. BOWEN,

               Defendants,

    and

**(a)** ALL RIGHT, TITLE AND INTEREST IN
THE REAL PROPERTY AND
APPURTENANCES KNOWN AS 1081
BARNEGAT LANE, MANTOLOKING,
NEW JERSEY, 08738;

**(b)** ALL RIGHT, TITLE AND INTEREST IN
THE REAL PROPERTY AND
APPURTENANCES KNOWN AS 436
GROVE STREET, WESTFIELD, NEW
JERSEY, 07090;

**AMENDED VERIFIED COMPLAINT**

No. 10 Civ. 4857 (ALC)

ECF Case

1

(c) ALL FUNDS ON DEPOSIT IN
ACCOUNT NO. 785-870624 AT TD
AMERITRADE, HELD IN THE NAME OF
JUDITH GAIL BOWEN;

(d) ALL FUNDS ON DEPOSIT IN
ACCOUNT NO. 7850349338 AT TD BANK,
HELD IN THE NAME OF JUDITH G.
BOWEN;

(e) ALL FUNDS ON DEPOSIT IN
ACCOUNT NO. 7850351268 AT TD BANK,
HELD IN THE NAME OF JO ANN CRUPI
OR JUDITH G. BOWEN;

(f) ALL FUNDS ON DEPOSIT IN
ACCOUNT NO. 7870002792 AT TD BANK,
HELD IN THE NAME OF JUDITH G.
BOWEN;

(g) ALL FUNDS ON DEPOSIT IN IRA
ACCOUNT NO. 786-065391 AT TD
AMERITRADE, HELD IN THE NAME OF
JO ANN CRUPI;

(h) CERTAIN FUNDS HELD ON
ACCOUNT FOR JOANN CRUPI BY
DUANE MORRIS LLP, 744 BROAD
STREET, NEWARK, NJ, 07102-3889,

and all property traceable thereto,

Defendants in rem.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Plaintiff the United States of America (the "Government"), by its attorney Preet Bharara,

United States Attorney for the Southern District of New York, for its amended verified

complaint (the "Complaint") alleges, upon information and belief, as follows:

## INTRODUCTION

1.     This action is brought by the Government pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A) seeking the forfeiture of certain property traceable to the massive Ponzi scheme orchestrated by Bernard L. Madoff ("Madoff") paid to or on behalf of long-time Madoff employee Joann Crupi, a/k/a "Jodi" ("CRUPI").

2.     By this Complaint, the Government seeks forfeiture of all right, title and interest in the following property:

(a)     ALL RIGHT, TITLE AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES KNOWN AS 1081 BARNEGAT LANE, MANTOLOKING, NEW JERSEY, 08738, SHOWN ON THE MUNICIPAL TAX MAP OF THE BOROUGH OF MANTOLOKING, OCEAN COUNTY, NEW JERSEY, AS LOT 33, BLOCK 24 (the "Mantoloking Property");

(b)     ALL RIGHT, TITLE AND INTEREST IN THE REAL PROPERTY AND APPURTENANCES KNOWN AS 436 GROVE STREET, WESTFIELD, NEW JERSEY, 07090, SHOWN ON THE TAX MAP OF THE TOWNSHIP OF WESTFIELD, UNION COUNTY, NEW JERSEY, AS BLOCK 4204, LOT 8.02 (the "Westfield Property");

(c)     ALL FUNDS ON DEPOSIT IN ACCOUNT NO. 785-870624 AT TD AMERITRADE, HELD IN THE NAME OF JUDITH GAIL BOWEN (the "0624 Account");

(d)     ALL FUNDS ON DEPOSIT IN ACCOUNT NO. 7850349338 AT TD BANK, HELD IN THE NAME OF JUDITH G. BOWEN (the "9338 Account");

(e)     ALL FUNDS ON DEPOSIT IN ACCOUNT NO. 7850351268 AT TD BANK, HELD IN THE NAME OF JO ANN CRUPI OR JUDITH G. BOWEN (the "1268 Account");

(f)     ALL FUNDS ON DEPOSIT IN ACCOUNT NO. 7870002792 AT TD BANK, HELD IN THE NAME OF JUDITH G. BOWEN (the "2792 Account"),

(g)   ALL FUNDS ON DEPOSIT IN IRA ACCOUNT NO. 786-065391 AT TD AMERITRADE, HELD IN THE NAME OF JO ANN CRUPI (the "5391 Account");

(h)   CERTAIN FUNDS HELD ON ACCOUNT FOR JOANN CRUPI BY DUANE MORRIS LLP, 744 BROAD STREET, NEWARK, NJ 07102-3889,

and all property traceable thereto,

(collectively, the "Defendants in rem").

3.   Upon entry of a final order forfeiting the Defendants in rem to the United States, the Government intends to distribute the net sale proceeds to victims of the fraud, consistent with the applicable Department of Justice regulations. *See* 21 U.S.C. § 853(i)(1); 28 C.F.R. Part 9.

4.   The Government also asserts common law claims of conversion and unjust enrichment, and claims for actual and constructive fraudulent transfers under the Federal Debt Collection Procedure Act ("FDCPA"), 28 U.S.C. § 3301, et seq., against CRUPI and her domestic partner, Judith G. Bowen ("BOWEN"), in connection with their misappropriation of funds, and structuring of transactions, to avoid the forfeiture of the Defendants in rem to the United States.

**JURISDICTION AND VENUE**

5.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a).

6.   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

## FACTUAL ALLEGATIONS

7.     The Government's claims arise out of the investigation of Bernard L. Madoff Investment Securities LLC, and its predecessor, Bernard L. Madoff Investment Securities (collectively and separately, "BLMIS").

8.     At all times relevant to this Complaint, BLMIS had its principal place of business in New York, New York, most recently at 885 Third Avenue, New York, New York.  BLMIS was a broker-dealer that engaged in three principal types of business operations:  (i) market making, (ii) proprietary trading, and (iii) investment advisory ("IA") services.

9.     BLMIS was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer and, as of on or about August 25, 2006, as an investment advisor.

10.     Madoff was the founder of BLMIS, and served as its sole member and principal. In that capacity, Madoff controlled the business activities of BLMIS.  Madoff also owned the majority of the voting shares and served as the Chairman of the Board of Directors of Madoff Securities International Ltd. ("MSIL"), a corporation incorporated in the United Kingdom. MSIL was an affiliate of BLMIS that engaged principally in proprietary trading.

11.     For decades, Madoff and others operated a massive Ponzi scheme through BLMIS, defrauding thousands of IA clients out of billions of dollars.  In or about late 2008, redemptions and requests for redemptions outpaced deposits at an increasing rate, and the scheme collapsed.  On or about December 11, 2008, Madoff was arrested by the FBI and charged with securities fraud and other offenses.  On or about December 12, 2008, BLMIS was ordered into receivership and, shortly thereafter, liquidation proceedings.

## A.   THE CRIMINAL CHARGES AND GUILTY PLEAS TO DATE

(1)   *United States* v. *Bernard L. Madoff*, 09 Cr. 213 (DC)

12.   On March 12, 2009, Madoff pleaded guilty to Information 09 Cr. 213 (DC), which charged him with securities fraud, investment advisor fraud, mail fraud, wire fraud, two counts of international money laundering, money laundering, false statements, perjury, false filings with the SEC, and theft from an employee benefit plan.  Among other things, Madoff admitted that despite his promise to current and prospective IA clients that he would invest their money in shares of common stock, options, and other securities of well-known corporations, he in fact almost never invested those client funds in the securities as he had promised.  Madoff further admitted that he attempted to conceal his fraud by, among other things, issuing false account statements and otherwise deceiving the IA Clients, lying to regulators, and wiring money between BLMIS (in the United States) and MSIL (in the United Kingdom) to create the impression that BLMIS was actually trading securities for the IA business.

13.   On June 29, 2009, the Honorable Denny Chin sentenced Madoff to 150 years' imprisonment, criminal forfeiture money judgments totaling $170,799,000,000, and forfeiture of specific property.  The Court also approved a settlement between the Government and Madoff's wife, who agreed to relinquish any claim she may have to any and all property held by or for herself and/or Madoff and to surrender the property to the Government, in exchange for a cash settlement representing a small fraction of the forfeited assets.

(2)   *United States* v. *David G. Friehling*, 09 Cr. 700 (AKH)

14.   On or about March 17, 2009, David G. Friehling, a Certified Public Accountant and sole practitioner whose firm purportedly audited BLMIS's financial statements from 1991 to

2008, was charged in a criminal Complaint with securities fraud, aiding and abetting investment adviser fraud, and filing false audit reports with the SEC.

15.     On or about November 3, 2009, Friehling pleaded guilty to a nine-count Superseding Information charging him with securities fraud, investment adviser fraud, four counts of filing false audit reports with the SEC, and three counts of obstructing or impeding the administration of the internal revenue laws.

16.     As part of his plea, Friehling also agreed to criminal forfeiture of $3,183,000 and his home in New City, New York, which he and his wife vacated and surrendered to the Government. Friehling also agreed to cooperate with the Government in its ongoing investigation of the fraud.

**(3)     *United States* v. *Frank DiPascali, Jr.*, 09 Cr. 764 (RJS)**

17.     Frank DiPascali, Jr. ("DiPascali") was employed at BLMIS from in or about 1975 to on or about December 11, 2008.  By the early 1990s, DiPascali was one of the BLMIS employees responsible for managing the majority of BLMIS's IA accounts into which thousands of BLMIS clients invested, and eventually lost, billions of dollars.

18.     On August 11, 2009, DiPascali pleaded guilty to Information 09 Cr. 764 (RJS), which charged him with conspiracy, securities fraud, investment advisor fraud, falsifying records of a broker-dealer, falsifying records of an investment advisor, mail fraud, wire fraud, international money laundering, perjury, and attempting to evade federal income taxes. DiPascali also agreed to cooperate with the Government in its ongoing investigation of the fraud.

19.     DiPascali also consented to the imposition of a criminal forfeiture money judgment in the amount of $170.25 billion and to forfeit all of his property, including a 61' luxury sportfisherman yacht, three luxury cars, his home in Bridgewater, New Jersey, and its

contents. DiPascali's wife and four children agreed to the forfeiture of the specific property

pursuant to a stipulation and order of settlement of their potential third-party claims, leaving Mrs.

DiPascali with a cash settlement representing a small fraction of the forfeited assets.

20.     In January 2010, DiPascali's family vacated their home in Bridgewater and

surrendered it to the Government. The house and most of the DiPascalis' vehicles, boats and

personal property already have been liquidated pursuant to interlocutory orders of sale entered on

consent. The Government also has recovered more than $500,000 that DiPascali transferred to

his sister, including interest.

(4)     *United States* v. *Daniel Bonventre, Annette Bongiorno, Joann Crupi a/k/a "Jodi,"
        Jerome O'Hara & George Perez*, S8 10 Cr. 228 (LTS)

21.     On or about March 24, 2010, Madoff employees Daniel Bonventre, Jerome

O'Hara, and George Perez were charged in Indictment S1 10 Cr. 228 (LTS) with conspiracy,

falsifying records of a broker-dealer, and falsifying records of an investment adviser. Bonventre

was also charged with securities fraud, false filings with the SEC, and subscribing to false

individual income tax returns.

22.     Superseding Indictment S2 10 Cr. 228 (LTS) was returned on or about

November 17, 2010. This superseding indictment added two defendants, longtime BLMIS

employees Annette Bongiorno and CRUPI, and expanded the time frame of the conspiracy in

which the defendants were charged.

23.     Superseding Indictment S8 10 Cr. 228 (LTS) was returned on or about October 1,

2012 (the "Indictment").[1] The Indictment added additional charges against Bonventre,

---

[1] Additionally, several criminal informations have been filed in this case. On June 6, 2011, Eric S. Lipkin, a BLMIS
employee, pled guilty to Superseding Information S3 10 Cr. 228 (LTS), charging him with conspiracy to falsify
records of a broker-dealer, to falsify records of an investment adviser, and to falsify statements to facilitate a theft
concerning ERISA, conspiracy to commit bank fraud, and related substantive offenses. Lipkin also agreed to
cooperate with the Government. On November 21, 2011, BLMIS employee David L. Kugel pled guilty to

Bongiorno, O'Hara, Perez, and CRUPI, and further expanded the time frame of the conspiracy in which the defendants were charged.  The Indictment is attached hereto as Exhibit A and incorporated by reference.

24.     Bonventre was employed by BLMIS from in or about 1968, through at least on or about December 11, 2008, and served as its Director of Operations at least as early as the 1980s. (Ind. ¶ 5).

25.     In his capacity as Director of Operations for BLMIS, Bonventre was responsible for, among other things: (a) maintaining and supervising the production of the principal internal accounting documents for BLMIS, including the General Ledger ("G/L"); (b) maintaining the stock record for BLMIS and resolving any discrepancies between internal and external records; (c) supervising the use and reconciliation of BLMIS bank accounts through which the market making, proprietary trading, and IA business operations were funded; including the bank account that was principally used to fund BLMIS's operations (over which Bonventre also had signature authority (the "BLMIS Operating Account")); (d) supervising BLMIS employees who were responsible for, among other things, accounting and the  settlement and clearing of trades

---

Superseding Information S4 10 Cr. 228 (LTS), charging him with conspiracy to commit securities fraud, to falsify records of a broker-dealer, and to falsify records of an investment adviser, conspiracy to commit bank fraud, and related substantive offenses. David Kugel also agreed to cooperate with the Government. On December 19, 2011, BLMIS employee Enrica Cotellessa-Pitz pled guilty to Superseding Information S5 10 Cr. 228 (LTS), charging her with conspiracy to falsify records of a broker dealer, to falsify records of an investment adviser, to make false filings with the SEC, and to obstruct and impede the lawful governmental function of the IRS, and related substantive offenses. Cotellessa-Pitz also agreed to cooperate with the Government. On June 5, 2012, Craig Kugel pled guilty to Superseding Information S6 10 Cr. 228 (LTS), charging him with conspiracy to falsify statements in relation to documents required by ERISA and to obstruct and impede the lawful governmental function of the IRS, related substantive offenses and subscribing to false individual income tax returns. Craig Kugel also agreed to cooperate with the Government. On June 29, 2012, BLMIS employee Peter Madoff pled guilty to Superseding Information S7 10 Cr. 228 (LTS), charging him with conspiracy to commit securities fraud, to falsify records of an investment adviser, to falsify records of a broker-dealer, to make false filings with the SEC, to commit mail fraud, to falsify statements in relation to documents required by ERISA, and to obstruct and impede the lawful governmental function of the IRS, and a related substantive offense. Peter Madoff was ultimately sentenced principally to a 10-year term of imprisonment. On November 8, 2012, BLMIS employee Irwin Lipkin pled guilty to Superseding Information S9 10 Cr. 228 (LTS), charging him with conspiracy to commit securities fraud, to falsify records of a broker-dealer, to falsify records of an investment adviser, to make false filings with the SEC, and to falsify statements in relation to documents required by ERISA, and a related substantive offense.

executed by the market making and proprietary trading operations; and (e) supervising BLMIS computer programmers O'Hara and Perez, insofar as their work related to the production of the G/L and other BLMIS accounting records.  (Ind. ¶ 5).

26.     Bonventre also acted as an authorized signatory for BLMIS in its business relationships with certain banks and the Depository Trust Company ("DTC").[2]  (Ind. ¶ 238(k)).

27.     O'Hara and Perez were employed by BLMIS starting in or about 1990 and 1991, respectively.  O'Hara and Perez each were responsible for, among other things, developing and maintaining computer programs for computers that supported the operations of BLMIS, including its market making, proprietary trading, and IA operations.

28.     Bongiorno was employed at BLMIS from in or about 1968 through at least on or about December 11, 2008.  During her employment, Bongiorno had a variety of duties and responsibilities, including supervision of the IA staff, but her principal job was managing hundreds of IA accounts held by high net-worth clients of BLMIS, which purportedly contained billions of dollars.

29.     CRUPI was employed at BLMIS from in or about 1983 through at least on or about December 11, 2008.  During her employment at BLMIS, CRUPI had a variety of duties and responsibilities, including tracking the daily activity of the bank account into which billions of dollars of IA clients' money for investment was deposited, and from which IA client redemptions were paid (the "IA Bank Account," as discussed more fully below), and directing wire transfers into and out of the IA Bank Account.  In addition, CRUPI managed several BLMIS IA accounts purportedly having a cumulative balance of approximately $900 million as

---

[2] Among other things, DTC creates efficiencies in the clearing and settlement of securities transactions by retaining custody of securities on behalf of financial institutions and recording on its books and records changes in the ownership of those securities.  BLMIS had an account at DTC in which the securities of the market making and proprietary trading operations were custodied, as well as a few securities held on behalf of certain IA Clients.  (Ind. ¶ 29(b) n.3).

of November 30, 2008, as described more fully in paragraphs 44 through 47, below. CRUPI also assisted DiPascali in managing IA accounts.

30.     The Indictment charges CRUPI with conspiracy to commit securities fraud, to falsify records of a broker-dealer, to falsify records of an investment adviser, and to commit mail fraud (Count One), conspiracy to commit securities fraud, to falsify records of a broker-dealer, and to falsify records of an investment adviser (Count Two), securities fraud (Counts Six and Seven), falsifying records of a broker-dealer (Counts Nine and Ten), falsifying records of an investment adviser (Counts Twelve and Thirteen), conspiracy to commit bank fraud (Count Sixteen), bank fraud (Count Seventeen), and tax evasion (Counts Thirty-One through Thirty-Three).

31.     The Indictment seeks the imposition of a criminal forfeiture money judgment in an amount representing the aggregate proceeds obtained as a result of the offenses charged in Counts One, Two, Three, Six, Seven, Eight, Nine, Ten, and Eleven, alleged to be at least $170 billion.

## B.   THE FRAUD

32.     From at least as early as the 1970s through on or about December 11, 2008, Madoff, DiPascali, and other co-conspirators perpetrated a scheme to defraud the clients of the BLMIS IA business ("IA Clients") by accepting billions of dollars of IA Clients' funds under false pretenses, failing to invest the IA Clients' funds as promised, creating and disseminating false and fraudulent documents to IA Clients purporting to show that their funds had been invested, creating false books and records of BLMIS, and lying to the SEC and an accounting firm to conceal the fraudulent scheme.

33.     To execute the scheme, Madoff solicited, and caused others to solicit, prospective clients to open trading accounts with BLMIS, based upon, among other things, a promise to use investor funds to purchase shares of common stock, options, other securities, and financial instruments, and representations that he would achieve high rates of return for clients with limited risk. These representations were false. Contrary to representations made on account statements and other documents sent to IA Clients, Madoff, DiPascali, and other co-conspirators knew that the IA Clients' funds were not being invested in securities as promised. Moreover, Madoff, DiPascali, and other co-conspirators misappropriated IA Clients' funds and converted those funds to their own use and the use of others.

34.     Madoff used an account in the name of BLMIS at JP Morgan Chase, New York, New York, for the receipt and disbursement of client funds for the IA business (the "IA Bank Account"). Billions of dollars of funds received from IA Clients for investment were deposited principally into the IA Bank Account. The funds used to fulfill requests from IA Clients for withdrawals from their BLMIS accounts were obtained principally from the IA Bank Account. Madoff also maintained a checking account at JP Morgan Chase that was affiliated with the IA Bank Account (the "IA Checking Account").

35.     From the outset of the scheme, and continuing throughout its operation, BLMIS obtained funds from IA Clients through interstate wire transfers from financial institutions located outside New York State and through mailings delivered by the United States Postal Service.

36.     The end-of-day balances in the IA Bank Account — balances that generally were in the range of hundreds of millions of dollars during the 2001-2008 period — were swept into a variety of overnight and other short-term deposit accounts. In addition, beginning in or about

2007, in excess of approximately $1 billion was invested in U.S. Treasury bills and other similar investments and was custodied in a separate account held by BLMIS at JPMorgan Chase. (The above-described BLMIS accounts held at JPMorgan Chase — including the IA Bank Account, the IA Checking Account, the overnight sweep and short-term deposit accounts, and the accounts that held the Treasury bills and other securities, but *not* including the BLMIS Operating Account referred to in paragraph 25 — collectively are referred to herein as the "Chase IA Accounts"). Interest earned on those investments generally was transferred to the IA Bank Account on a regular basis. (Ind. ¶ 122).

37.    BLMIS maintained a separate bank account that was principally used to fund, directly and indirectly, the operations of BLMIS — the BLMIS Operating Account referred to in paragraph 25 — and was custodied most recently at Bank of New York Mellon in New York, New York ("BNYM"). BLMIS also opened one or more lines of credit at BNYM. (Ind. ¶ 123).

38.    At all times relevant to this Complaint, BLMIS also maintained brokerage accounts at a variety of financial institutions (the "IA Brokerage Accounts"). Funds in the IA Brokerage Accounts generally were invested in U.S. Government-issued securities such as U.S. Treasury bills. (Ind. ¶ 124).

39.    At all times relevant to this Complaint, MSIL maintained a bank account in the United Kingdom (the "MSIL Bank Account"). (Ind. ¶ 125).

40.    At all times relevant to this Complaint, the balance and the funds transferred into and out of the IA Bank Account were tracked on a daily basis. From approximately the mid-1990s, through in or about December 2008, on a daily basis, CRUPI, and others, recorded this information on handwritten note cards (the "Note Cards"). CRUPI, and others, also prepared a handwritten report for Madoff and others (the "Daily Report"). The Daily Report set forth on a

single page the day's opening balance, the end-of-day balance, the funds transferred to BLMIS by check or wire by IA Clients that were deposited into the IA Bank Account, and funds transferred out of the IA Bank Account, including redemptions sent to IA Clients. The Daily Report also listed redemptions that IA Clients had requested but that had not yet been fulfilled. (Ind. ¶¶ 126-27).

41.     By tracking, on a daily basis, the cash flowing into and out of the IA Bank Account and listing the redemptions that had been requested but not yet fulfilled, the Daily Report enabled Madoff, DiPascali, CRUPI, and others to determine whether there were sufficient funds available to cover requested redemptions. When the balance on the Daily Report appeared too low to cover the expected redemptions, CRUPI often brought this to the attention of DiPascali or Madoff and asked them whether additional client funds would be coming in to BLMIS to cover the expected redemptions. (Ind. ¶¶ 128-29).

42.     From at least in or about the 1990s through in or about 2008, Bonventre reconciled or supervised the reconciliation of the IA Bank Account on a monthly basis. In addition, Bonventre often reviewed and initialed the Note Cards maintained by CRUPI. (Ind. ¶ 130).

43.     From at least as early as the 1990s, through in or about December 2008, Bongiorno managed hundreds of IA Clients' accounts for which BLMIS purportedly used an investment strategy, which employed primarily long and short equities and options. The accounts managed by Bongiorno purportedly had a cumulative balance of approximately $8.5 billion as of November 30, 2008. (Ind. ¶ 41).

44.     From at least as early as the 2000s, through in or about December 2008, CRUPI also managed several IA accounts affiliated with an IA Client (the "CRUPI High Net Worth

Client") that were purportedly invested in equities and options.  As of November 30, 2008, these accounts had a cumulative balance of approximately $900 million.  (Ind. ¶¶ 41, 55).

45.    Bongiorno and CRUPI managed these IA accounts by identifying which (fictitious) trades to include on IA Clients' account statements using historical price information reported in the Wall Street Journal and Bloomberg.  Bongiorno and CRUPI created trades with the goal of arriving at a specific annual rate of return, called a "benchmark" rate of return, that was predetermined by Madoff.  Benchmark returns ranged from approximately 11 percent to up to at least approximately 45 percent per year and varied depending on the IA Client.  Madoff communicated the benchmark returns for each account or group of accounts to Bongiorno and CRUPI, who in turn caused the benchmark returns to be entered into a computer dedicated to the IA business (*see* paragraph 49, below (discussing the "House 17" computer)).  (Ind. ¶ 42).

46.    At the end of each month, quarter, or year, Bongiorno and CRUPI, and others, reviewed BLMIS reports comparing the benchmark return for each account with the purported year-to-date "returns" earned by IA accounts they managed.  When there were differences between the benchmark returns and the returns that purportedly had been earned by the time the reports were run, Bongiorno, CRUPI, and others, created trades and adjustments in certain IA Clients' accounts to ensure that the annual returns reported to the IA Clients appeared to meet or exceed their expected returns.  (Ind. ¶ 43).

47.    From approximately the early 2000s, through in or about December 2008, during the course of CRUPI's management of the IA accounts affiliated with the CRUPI High Net Worth Client, CRUPI created account statements, trade confirmations, and other documents that reflected securities transactions that had not been executed and securities positions that did not exist.  In addition, CRUPI, among other things, (a) "executed" trades in the accounts of the

15

CRUPI High Net Worth Client only on paper, based on historically reported prices of securities that she researched, and that achieved annual rates of return that had been predetermined by Madoff; (b) backdated the purchase dates of purported trades so that she could control the amount of gains reflected in the CRUPI High Net Worth Client accounts; (c) "executed" the purchase and sale of particular securities on the same date; (d) caused dividends to be credited to the CRUPI High Net Worth Client account statements before the dividends had been paid by the issuing company; (e) caused wire transfers to be sent to the CRUPI High Net Worth Client before any securities were "sold" in the accounts and, days later, backdated purported sales of securities or U.S. Treasury bills to match the date of the wire transfers, making it appear that the sales occurred on the same day as the wire transfers. (Ind. ¶ 55).

48.    Madoff also used so-called "BLM Special Accounts" as a mechanism for transferring money out of the IA Bank Account for the personal benefit of himself and his family members, making purported "loans" to friends and family members, paying personal expenses, and making charitable contributions. CRUPI facilitated "BLM Special" wire transfers from the IA Bank Account and kept records for the "BLM Special" accounts in her desk files and on her computer.

49.    A computer dedicated to the IA business, referred to by certain BLMIS employees as "House 17," supported the operations of the IA business. House 17 did not receive trading data related to the IA business electronically from any computer that communicated with third parties, including trading contra parties, nor did House 17 reconcile the purported trade data generated by BLMIS employees against any outside source. Rather, Madoff, DiPascali, Bongiorno, CRUPI, and others involved in the IA business created trading data related to the

purported activities of the IA business and caused that data to be entered into the House 17 server.  (Ind. ¶¶ 22, 30-31).

50.     Computer programs developed and maintained by O'Hara and Perez on House 17 (the "House 17 Programs") were used to enter the fake IA business trade data.  The House 17 Programs were used to generate, among other things, account statements and trade confirmations sent to IA clients via the United States Postal Service, as well as trading blotters, and other books and records related to BLMIS's purported IA business.  With few exceptions, the books and records generated by the House 17 Programs for BLMIS's IA business were entirely false and fraudulent because, among other things, they purported to reflect securities transactions that, in fact, had never been executed.  (Ind. ¶¶ 31-33).

51.     In or about the early 1990s, when some House 17 programs were modified to track investor trades, Bongiorno requested the ability to backdate trades and manipulate the appearance of IA account statements.  Bongiorno worked closely with Bonventre to develop the programs that could produce the manipulated account statements, transactions, and balances; and, on occasion, Bongiorno described in written detail to Bonventre how she wanted these programs to work.  (Ind. ¶ 50).

52.     Between 2003 and 2008, when BLMIS underwent at least five separate reviews by the SEC and a European accounting firm (the "European Accounting Firm") (collectively, the "Reviews"), CRUPI helped create "special" fake versions of historical BLMIS books and records for the purpose of concealing the fraudulent nature and the extent of the IA operation. The "special" books and records were created for a small fraction of the thousands of BLMIS IA Clients (the "Special Clients") in order to conceal the scale of the IA operation.  CRUPI assisted in the selection of the "Special Clients'" accounts that would be shown to the SEC and the

European Accounting Firm and maintained a list of the Special Clients at her desk.  (Ind. ¶¶ 57-60).

53.     In connection with the Reviews, for the purpose of concealing the fraudulent nature and the extent of the IA operation, CRUPI also helped create false retrospective daily trade blotters (the "Special Blotters") that purported to identify, on a trade-by-trade basis, information such as the client for whom the trade was conducted, the contra party to the trade, the number of shares traded, and the price at which the trade was executed.  In fact, the details of the trades reported on the Special Blotters, such as the contra parties, the number of shares traded, and the execution times and transaction numbers, were materially inconsistent with information contained in the BLMIS Settled Trades File (which itself was fictitious).  CRUPI also checked the Special Blotters to ensure that the information reported looked "random" enough to appear authentic.  (Ind. ¶¶ 61-72).

54.     In connection with the Reviews, CRUPI helped create fake IA account statements for the Special Clients.  Unlike the (fraudulent) account statements that were actually sent to the IA Clients, these account statements made it appear as if BLMIS was not holding securities on behalf of the IA Clients and did not have custody of the IA Clients' assets.  (Ind. ¶¶ 77-82).

55.     In early April 2006, on or about the same dates, Bonventre, O'Hara and Perez each emptied their IA Accounts.  (¶¶ 107-11).  In or about the Fall of 2006, O'Hara and Perez told Madoff and DiPascali that they would no longer create computer programs for use in producing false and fraudulent BLMIS books and records.  When CRUPI learned that O'Hara and Perez were refusing to create the computer programs, she offered to provide additional assistance with the "special" work.  (Ind. ¶¶ 112, 116).

56.     In or about the Fall of 2006, in an effort to keep O'Hara and Perez working at BLMIS, Madoff authorized DiPascali to meet any salary demands O'Hara and Perez might make. O'Hara and Perez demanded, and received, salary increases of approximately 20 percent, and also received net bonuses of approximately $64,812, and $60,165, respectively. During the same time period, CRUPI's salary was also increased by approximately 20 percent. (Ind. ¶¶ 113-15).

57.     In or about February 2008, the European Accounting Firm conducted another review of BLMIS. Notwithstanding their earlier refusal to participate in creating any more fake books and records, O'Hara and Perez agreed to write computer programs that allowed DiPascali, CRUPI, and others to use House 17 to alter data about IA Clients and to produce false and fraudulent BLMIS books and records in connection with the review. (Ind. ¶ 117).

58.     In or about 2008, CRUPI received another salary increase of approximately 20 percent. (Ind. ¶ 118).

59.     From 2004 to 2008, during the time period of the Reviews, CRUPI's salary rose from approximately $221,000 in 2004 to $354,000 in 2008.

60.     CRUPI also created false and misleading information to be provided to banks in connection with bank loans. In or about fall of 2002, David Kugel applied for a mortgage for his home in Boca Raton, Florida. In his application to the lender, David Kugel claimed that his BLMIS IA account had a balance of approximately $5.75 million. In further support of his application, David Kugel submitted a letter on BLMIS letterhead, dated September 19, 2002, and signed by CRUPI that stated that the balance in his IA account as of August 31, 2002, was approximately $5,998,572, when in fact it was only approximately $804,538 according to BLMIS's books and records. Immediately prior to closing, the lender sent a Request for

Verification of Deposit ("VOD") to BLMIS to verify the account balance in the IA account of David Kugel. In response, CRUPI sent a form dated October 24, 2002, and signed by her as "Account Executive," indicating that the then-current balance of David Kugel's IA account was approximately $5,916,392. In fact, the October 31, 2002 IA account statement for David Kugel's IA account reflected a purported net equity balance of approximately $668,152. Based upon David Kugel's fraudulent submission to the lender, including the false letter and VOD from CRUPI, the lender approved the loan application and granted the loan. (Ind. ¶¶ 163-64).

61.     Similarly, in or about the Fall of 2002, David Kugel applied for a mortgage for a home in Long Island, New York. In order to inflate artificially the value of his IA account and qualify for the mortgage loan, David Kugel and Madoff agreed that David Kugel would send a letter to the lender indicating that he had equity equal to the value of the long amount of securities in his IA account and omitting the short positions and margin balances. At David Kugel's request, CRUPI prepared the letter, which misstated David Kugel's IA account balance, and which David Kugel provided to the lender. Prior to the closing, the lender requested two months' worth of David Kugel's IA account statements. CRUPI provided David Kugel with IA account statements for the months of January and February 2003 which misstated the account balance, and thereby made David Kugel's IA account value appear greater than it actually was. David Kugel subsequently faxed these statements to the mortgage broker who provided them to the lender and closed on the sale. (Ind. ¶¶ 165-66).

62.     In or about early 2002, David Kugel assisted an individual ("Purchaser A") in obtaining a mortgage loan with which to purchase an apartment in Manhattan. In order to secure the mortgage with the lender, David Kugel needed to demonstrate that Purchaser A had the necessary assets to qualify for the loan. To show the lender that Purchaser A had more assets

than Purchaser A actually had, David Kugel and Madoff agreed to misstate the value of Purchaser A's IA account. In or about March 2002, David Kugel asked CRUPI to write a letter stating that Purchaser A's IA account at BLMIS was valued at an amount different from what the IA account statements reflected. CRUPI then provided David Kugel with a letter that misstated the value of Purchaser A's IA account. David Kugel then provided that letter to the lender. In or about May 2002, CRUPI responded to a Request for a "Verification of Deposit" ("VOD") from the mortgage broker with respect to Purchaser A's IA account. In the VOD, CRUPI stated that Purchaser A's IA account balance was several hundred thousand dollars greater than it actually was and CRUPI signed the form as the "Account Manager." (Ind. ¶¶ 167-69).

63.    In or about 2005, David Kugel informed Bernard L. Madoff that he needed to obtain a mortgage loan for his son, Craig Kugel, and that Craig Kugel's IA account needed to reflect more assets than it actually had. In or about late 2005, CRUPI signed two letters for the mortgage broker misstating the value of Craig Kugel's IA account. (Ind. ¶ 170).

64.    In or about 2007, in connection with a construction loan for Craig Kugel, David Kugel, Madoff, and CRUPI again misstated the value of Craig Kugel's IA account in order to secure a loan. In or about July 2007, CRUPI signed a letter to the mortgage broker that misstated the value of Craig Kugel's IA account by several hundred thousand dollars. CRUPI later informed Craig Kugel that she had received a verification request from the lender and that she verified the account value to the lender. Further, in or about September 2007, CRUPI provided a letter to the mortgage lender entitled "Verification of Deposit." In that letter, CRUPI again misstated the value of Craig Kugel's IA account. (Ind. ¶ 172).

65.    From at least in or about the Fall of 2008, requests for redemptions made by BLMIS IA Clients began to increase at a rate greater than investments made by new or existing

clients.  By in or about mid-November 2008, as this liquidity crisis deepened, Madoff, DiPascali, CRUPI, and others were concerned that BLMIS would not be able to fulfill the requests for redemptions, which were outpacing deposits at an increasing rate.  (Ind. ¶ 216).

66.    On or about November 3, 2008, the balance of the IA Bank Account reflected on the Daily Report — which was prepared or maintained by CRUPI — showed a balance of approximately $487 million, and unfulfilled requests for redemptions totaling approximately $1.447 billion.  (Ind. ¶ 217).

67.    On or about November 17, 2008, Bonventre called a bank to inquire about the possibility of BLMIS obtaining a loan of approximately $200 million using federal bonds as collateral, but no such loan was obtained.  (Ind. ¶ 218).

68.    On or about November 25, 2008, the balance of the IA Bank Account reflected on the Daily Report showed a balance of approximately $266 million, and unfulfilled requests for redemptions totaling approximately $759 million.  (Ind. ¶ 220).

69.    On or about December 1 and December 2, 2008, approximately $181 million was transferred from the BLMIS Operating Account to the IA Bank Account.  To account for the transfer, Bonventre created and directed the inclusion of entries in the G/L, and its supporting books and records, to give the false appearance that BLMIS had spent $135 million to purchase Federal Home Loan Bank ("FHLB") bonds.  The bonds that BLMIS had supposedly purchased had the same CUSIP number as FHLB federal bonds — valued at $181 million — that a BLMIS IA Client had recently transferred to BLMIS for crediting to the Client's IA accounts.  (Ind. ¶¶ 219-224).

70.    By on or about December 4, 2008, the balance of the IA Bank Account, as reflected on the Daily Report, showed a balance of only approximately $295 million, and

unfulfilled requests for redemptions totaling approximately $1.455 billion — nearly twice the amount that had been reflected on the November 25, 2008 Daily Report. (Ind. ¶ 226).

71.    On or about December 3, 2008, CRUPI and DiPascali met on a street corner near the BLMIS office. DiPascali told CRUPI that Madoff had just told him that BLMIS was out of money and that there were no assets standing behind the BLMIS obligations reflected in the IA Clients' account statements. (Ind. ¶ 225).

72.    In the days after December 3, CRUPI and DiPascali discussed what they would say to law enforcement authorities once BLMIS eventually collapsed. CRUPI told DiPascali that she was going to say that she thought that the trades executed on behalf of the IA Clients were being done overseas. (Ind. ¶ 227).

73.    On or about Sunday, December 7, 2008, CRUPI met DiPascali at a restaurant in New Jersey. CRUPI told DiPascali that she was "sticking to my story," and would tell law enforcement authorities that she thought that the trades executed on behalf of the IA Clients were being done overseas. (Ind. ¶ 228).

74.    From approximately on or about December 3, 2008, through approximately on or about December 10, 2008, Madoff, DiPascali, CRUPI, and others continued to accept more than approximately $48 million in new deposits from investors. (Ind. ¶ 229).

75.    During this time period, DiPascali, CRUPI, and others prepared lists reflecting preferred employees, employee family members, and certain other IA Clients, and the balances in their respective IA accounts. DiPascali, CRUPI, and others also prepared or caused to be prepared more than approximately $300 million in checks so that the funds remaining at BLMIS would be sent to employees, their family members, and preferred IA Clients. (Ind. ¶ 230). Four of these checks were written to CRUPI or BOWEN and totaled approximately $1,632,146.

76.    At the time BLMIS collapsed — on or about December 11, 2008 — CRUPI had in her desk numerous documents reflecting attempted liquidations in favor of preferred IA Clients, employees, family, and friends. (Ind. ¶ 231).

77.    The assets that remained at BLMIS after its collapse were inadequate to reimburse the IA Clients whose investments over the years had exceeded their redemptions by billions of dollars in the aggregate.

78.    On November 21, 2011, in connection with his guilty plea, BLMIS employee David L. Kugel stated under oath:

> [B]eginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades. I provided historical trade information – sorry – first to Annette Bongiorno, and later to Joanne Crupi, and others which enabled them to create fake trades what, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred. I helped Bongiorno, Crupi and others create these fake, backdated trades based on historical stock prices and were executed only on paper.

> . . . .

> [F]rom at least from 2002 through 2007, on several occasions, I caused false financial information to be submitted to various financial institutions on my behalf and on behalf of other potential borrowers. The false financial information was submitted in connection for applications for mortgage loans.

> I asked Joann Crupi to prepare documents that did not accurately reflect my assets and the assets of others at BLMIS and she did so. Those documents overstated the total value of my own and the other potential borrowers' holdings in accounts at BLMIS. These fake documents were submitted to financial institutions on my behalf and on behalf of other potential borrowers.

Nov. 19, 2012 Tr. 32-33.

## C.   CRUPI, BOWEN, THEIR INCOME, ASSETS, AND EXPENSES

79.    Since at least as early as in or about the 1990's, CRUPI and BOWEN used the proceeds of the BLMIS fraud to accumulate significant wealth and to bankroll their living expenses as well as large discretionary expenditures.

80.    CRUPI received significant salary, bonus, and other payments from BLMIS.  She owned or controlled a number of IA accounts and received proceeds from fictitious trades executed in those accounts.  CRUPI also charged a substantial number of personal and family expenses to her BLMIS American Express card without ever reimbursing the firm.

81.    CRUPI and BOWEN have lived together and have owned real and personal property jointly since at least in or before September 1997, when they purchased their primary residence in Westfield, New Jersey.  They continue to hold that property as joint tenants with right of survivorship — that is, in the event of the death of either CRUPI or BOWEN, full ownership passes to the survivor.

82.    Since in or about the 1990's until the present, CRUPI and BOWEN have each received salary, bonus, and other benefits from their respective employer(s).  Until BLMIS's collapse at the end of 2008, CRUPI's take-home salary and other benefits significantly outstripped BOWEN's, and even including the last several years — in which CRUPI has earned virtually nothing — CRUPI's total contribution to the family's net worth has dwarfed BOWEN's.

83.    In or about the 2000's, CRUPI and BOWEN adopted two children with whom they live as a family.  As a single household, CRUPI and BOWEN have a common set of living expenses, including housing (mortgage, taxes, insurance, maintenance and other costs), furniture, groceries, child care, medical, sports and activity fees and other child-related expenses, utilities,