transportation, clothing, gifts, veterinary and other pet-related expenses, entertainment, and debt service. They also have a common set of discretionary expenditures, which have included dining out in restaurants at significant expense, large purchases of wine and/or liquor, frequent vacations, foreign travel, investments, and college savings accounts for their children.

84. CRUPI and BOWEN maintain a network of bank accounts and other assets, including financial institution accounts and instruments, securities, limited liability corporations and real property. Regardless of the name in which each such asset is held, CRUPI and BOWEN treat both their income and their assets as commonly owned, and use them as a common resource pool from which they fund significant expenditures and investments for their mutual benefit.

85. CRUPI and BOWEN have engaged in a pattern of transferring funds between and among their various bank and other accounts, treating assets held in one of their names as jointly held property, holding funds derived from BLMIS in accounts held solely in BOWEN's name — on many occasions, only to transfer some or all of such funds, directly and/or indirectly, back to CRUPI, and titling property exclusively derived from BLMIS funds in BOWEN's name only.

86. As detailed more fully in paragraphs 87-163 below, the persistent and pervasive recycling of funds between and among accounts held by CRUPI and/or BOWEN, the titling of assets derived from BLMIS in BOWEN's name, or in the name of a limited liability corporation ("LLC") held ostensibly by CRUPI and BOWEN but funded exclusively by CRUPI with funds from BLMIS, and the intentional dissipation of property directly traceable to the fraud to fund CRUPI and BOWEN's expenses, is tantamount to a shell game, creating the illusion that certain of the available assets of CRUPI and BOWEN are derived from their legitimate employment. In truth and in fact, the assets of CRUPI and BOWEN constitute property involved in and traceable to financial transactions engaged in for the purpose of concealing and disguising the nature, the

location, the source, the ownership, and the control of the proceeds of the Madoff fraud, and property traceable to proceeds of the fraud and property commingled with proceeds of the fraud. As such, they are subject to forfeiture to the United States.

**(1)    BLMIS Salary and Bonus Payments**

87.    From 1999 to 2008, CRUPI received the following approximate amounts as salary, and, in some years, bonuses, from BLMIS:

| Year | Salary (and Bonus, if Applicable) |
|------|-----------------------------------|
| 1999 | 128,468 |
| 2000 | 136,172 |
| 2001 | 149,712 |
| 2002 | 148,020 |
| 2003 | 143,490 |
| 2004 | 221,174 |
| 2005 | 212,472 |
| 2006 | 265,518 |
| 2007 | 293,964 |
| 2008 | 354,058 |

88.    Beginning on or about November 28, 2001, CRUPI had her BLMIS salary payments directly deposited into Account No. 7850351268 at Commerce Bank (the "1268 Account"), subsequently known as TD Bank.  See paragraph 98, below.

**(2)    Off-the-Books Income**

89.    In addition, between in or about 2004, and in or about 2008, CRUPI charged approximately $270,000 in personal expenses to her corporate platinum American Express card and never reimbursed BLMIS, which paid the bills.  The purchases included home furnishings, food and wine, and airline tickets and hotel charges for frequent trips taken by CRUPI, BOWEN, and their children to destinations such as Las Vegas, Disney World, and the Cayman Islands. The approximate annual amounts of such charges are detailed below:

| Year | Approximate Amount of Personal Charges |
|------|----------------------------------------|
| 2004 | $40,757 |
| 2005 | $56,238 |
| 2006 | $52,042 |
| 2007 | $63,120 |
| 2008 | $55,069 |

None of the more than approximately $270,000 in benefits received by CRUPI was reflected in the records of BLMIS, or reported by BLMIS or CRUPI to the United States Internal Revenue Service, as wages or any other form of compensation. (Ind. ¶¶ 211-12).

(3)    Backdated, Fictitious Trades in IA Accounts

90.    CRUPI owned or controlled a number of IA accounts, held in her own name, BOWEN's name, and the names of CRUPI family members (collectively, the "CRUPI IA Accounts"). The benchmark rates of return for the CRUPI IA Accounts ranged from 15% to 24%. (See paragraphs 45-46, above).

91.    CRUPI withdrew a total of over $2,432,752 from the CRUPI IA Accounts. According to internal BLMIS records, at the time of the firm's collapse, the CRUPI IA Accounts had a cumulative (negative) balance of approximately -$355,846 as a result of withdrawals that exceeded purported deposits or credits.

92.    CRUPI used her IA Accounts to profit from backdated, fictitious trades and to generate fake losses for the purpose of reducing tax liability. For example:

a.    In the Fall of 2008, two fake options trades instigated by CRUPI resulted in enormous gains in CRUPI IA Account No. 1-C1210. The first, in or about September 2008, resulted in a gain of approximately $446,000. The second, in or about November 2008, resulted in a $245,000 profit.

b.    Fake options trades were also created in one of the CRUPI IA Accounts for the purpose of generating losses for tax purposes. Trades conducted in or about

November 2001, December 2002, and December 2003 generated approximately $26,214, $15,504, and $3,000 in losses, respectively.

(4)   **Crupi's Receipt of Other Funds from the Chase IA Accounts**

93.   CRUPI also received approximately $3,040,000 from the Chase IA Accounts that was not shown as a debit to or withdrawal from any of the CRUPI IA Accounts, nor was the money indicated in the records of BLMIS as a salary, bonus, or other type of compensation to CRUPI. Specifically:

a.   On or about October 23, 2008, CRUPI caused a check in the amount of $340,000 to be drawn on the IA Checking Account. The check, which was made payable to Bank of America, contained a memo reference to a BLM Special account. CRUPI used the check to pay down the Home Equity Line of Credit on her home in Westfield, New Jersey.

b.   In or about 2008, CRUPI also received two wire transfers totaling $2,700,000 from the IA Bank Account, neither of which was indicated in the records of BLMIS as salary, bonus, or other type of compensation to CRUPI. CRUPI used the money, in large part, to purchase a beach house for $2,225,000 in Mantoloking, New Jersey. (See paragraphs 141-142, 144, 152, below). (Ind. ¶¶ 119-20).

(5)   **Bowen's Other Sources of Income**

94.   From 2001 to 2010, BOWEN received the following approximate amount of take-home pay from legitimate employment:

| Year | Approximate Net Payroll Deposited in Bowen's Account |
|------|------------------------------------------------------|
| 2001 | 13,996 |
| 2002 | 66,150 |
| 2003 | 50,623 |
| 2004 | 11,846 |
| 2005 | 2,281 |
| 2006 | 483 |
| 2007 | 553 |
| 2008 | 8,504 |
| 2009 | 71,960 |
| 2010 | 89,582 |

95.     Beginning at least as early as November of 2001, Bowen's salary payments were directly deposited into Account No. 7850349338 at Commerce Bank (the "9338 Account"), subsequently known as TD Bank.  See paragraph 106, below.

96.     Even in her highest earning years, Bowen's income was no match for the money CRUPI and BOWEN received from BLMIS.  Even the CRUPI-BOWEN family expenses charged to CRUPI's BLMIS American Express card from 2004 through 2008 dwarf Bowen's take-home pay for the corresponding years.

## THE DEFENDANTS IN REM

97.     The Defendants in rem constitute property traceable to funds obtained from defrauded investors of the BLMIS IA operation, and property traceable to such property.

(a)     **The 1268 Account**

98.     CRUPI opened checking Account No. 7850351268 at TD Bank — *i.e.*, the 1268 Account — on or about November 25, 2001.  Although BOWEN's name is also on the account, the account was used primarily by CRUPI.  For example, beginning at least as early as

November of 2001, CRUPI had her BLMIS salary and related payments deposited directly into the 1268 Account.

99.    Between in or about June 2005 to in or about July 2008, approximately $481,500 was transferred from the IA Bank Account to the 1268 Account.

100.    From at least as early as in or about 2001 to in our about 2009, substantial sums of money were transferred from the 1268 Account, directly and indirectly, to accounts associated with BOWEN, including the 9338 Account.

101.    By way of example, on various occasions, CRUPI made investments funded from the 1268 Account with money she received from BLMIS. When the investments were liquidated, however, rather than deposit the proceeds back in CRUPI's 1268 Account, the proceeds were deposited into BOWEN's 9338 Account.

102.    In addition, as set forth below, substantial sums of money traceable to BLMIS have been transferred to the 1268 Account after being funneled through BOWEN's 9338 Account and/or another account held in BOWEN's name, Account No. 785-870624 at TD Ameritrade (the "0624 Account").

103.    On approximately six occasions during the period from in or about January 2002 to in or about October 2003, a total of approximately $81,700 was transferred to the 1268 Account from accounts held by CRUPI and BOWEN jointly.

104.    When the 1268 Account ceased receiving money directly from BLMIS, in or about March 2009, and continuing to in or about May 2009, approximately $39,000 was deposited into the 1268 Account from the 9338 Account or the 0624 Account. Specifically:

a.    On or about March 23, 2009, approximately $15,000 was transferred to the 1268 Account from the 9338 Account.

b.    On or about March 30, 2009, approximately $9,000 was transferred to the 1268 Account from the 9338 Account.

c.    Approximately $15,000 was transferred to the 1268 Account from the 0624 Account in two installments, on or about April 15, 2009 and May 5, 2009.

105.    On or about October 14, 2009, approximately $100,000 was transferred to the 1268 Account from the 0624 Account.

(b)    The 9338 Account

106.    BOWEN opened the 9338 Account on or about November 25, 2001.  Beginning on or about December 6, 2001, BOWEN's salary payments were deposited directly into the 9338 Account.

107.    From in or about October 2003 to in or about December 2008, the 9338 Account received a total of approximately $1,064,838 directly from the IA Bank Account.

108.    Of this approximately $1,064,838, approximately $194,013 was transferred to the 9338 Account on or about November 22, 2006.  Of the approximately $194,013:

a.    From on or about November 24, 2006 to on or about January 4, 2007, $146,000 of the $194,013 was transferred in turn to the 0624 Account (see paragraph 132.c, below).

b.    $50,000 was transferred on or about November 24, 2006 to the 1268 Account. CRUPI in turn used the $50,000 to purchase a Certificate of Deposit.

c.    Approximately $35,000 was transferred to various funds associated with Vanguard.

d.    $15,000 was transferred to Bank of America.

109.    Approximately $742,000 was wired to the 9338 Account from the IA Bank Account on or about November 5, 2008, when BLMIS was on the brink of collapse.  A large portion of the $742,000 is traceable to a convoluted series of transfers among bank accounts

32

which began on or about June 25, 2008, when CRUPI caused approximately $475,000 to be wired from the IA Bank Account to make a deposit on the purchase of a beach house in Mantoloking, New Jersey. (See paragraphs 141-145, below).

110.    As set forth above, significant funds were transferred from the 9338 Account, or from another account associated with BOWEN, to the 1268 Account.

111.    From in or about January 2009 to in or about June 2011, approximately $158,000 was transferred from the 0624 Account to the 9338 Account, in amounts ranging from $4,000 to $25,000.

112.    On or about April 27, 2009, Bowen deposited a $5,715 payment for the rental of the Mantoloking Property into the 9338 Account.

113.    On various occasions, CRUPI made investments with money CRUPI received from BLMIS via the 1268 Account, and when the investments were liquidated, the proceeds were returned to the 9338 Account. For example, on or about January 8, 2011, accounts held in the name of "CharlieBoy LLC" and "Moon and Back LLC" were closed and the combined approximate balance (approximately $5,656), was deposited into the 9338 Account. CharlieBoy and Moon and Back were among a number of limited liability corporations ("LLCs") CRUPI and/or BOWEN formed as vehicles to purportedly invest in leases to oil-producing land. The investments were financed with funds directly derived from BLMIS.

114.    The balance of the 9338 Account on or about February 6, 2013 was approximately $23,921.38.

(c)    **The Westfield Property**

115.    On or about September 30, 1997, CRUPI and BOWEN purchased a single-family home located at 436 Grove Street, Westfield, New Jersey, for $412,000. The property is held by

CRUPI and BOWEN as joint tenants with right of survivorship, with respective ownership interests of 65% (CRUPI) and 35% (BOWEN).

116.   At least as early as November 2001, monthly mortgage payments on the Westfield Property were made from CRUPI's 1268 Account to Countrywide Home Loans.

117.   In 2002, CRUPI and BOWEN refinanced the existing mortgage on the Westfield Property, paying off the $302,000 balance with a new mortgage in the amount of $300,000 from Wells Fargo Home Mortgage, Inc. ("Wells Fargo").

118.   On or about September 16, 2002, on a Uniform Residential Loan Application submitted to Wells Fargo in connection with the mortgage refinancing, CRUPI stated that she had been employed with BLMIS for at least 19 years, and had held her current position, as Portfolio Manager, for nine years.

119.   The payments on the Wells Fargo mortgage were, in large part, derived from BLMIS. For example, from in or about 2002 to 2004, CRUPI used $73,400 received from BLMIS as salary and/or bonus to make payments on the mortgage. In 2005, CRUPI paid approximately $13,300 on the mortgage using her salary and/or bonus income from BLMIS. In 2005, CRUPI also made a $4,000 payment to Wells Fargo using a check drawn on the IA Checking Account. The $4,000 was recorded as a debit to CRUPI IA Account No. 1-C1210.

120.   On or about January 9, 2006, CRUPI satisfied the Wells Fargo mortgage in full by wiring approximately $172,257.45 to Wells Fargo from the 1268 Account. This transfer was funded with a check for $175,000 dated January 6, 2006, that was deposited into the 1268 Account. The check was drawn on the IA Checking Account, made payable to CRUPI and BOWEN, and was recorded as a debit to CRUPI IA Account No. 1-C1210.

121.   Thus, as of in or about January 2006, a large portion of the equity in the Westfield Property was paid for with money from BLMIS.

122.   On or about April 6, 2006, CRUPI and BOWEN used the Westfield Property to secure a home equity line of credit ("HELOC") in the amount of $500,000 from Bank of America, N.A. ("BOA").

123.   Payments were made on the HELOC in unremarkable amounts until on or about October 23, 2008, when CRUPI used a check in the amount of $340,000 drawn on the IA Checking Account to pay down the HELOC.  The check, which was made payable to BOA, contained a memo reference to a BLM Special account.

124.   CRUPI and BOWEN used the BOA HELOC, among other things, for living expenses, to pay approximately $313,429 in federal taxes, and, purportedly, to invest — through one or more of their LLCs — in leases to oil-producing land.  In or about September 2010, CRUPI paid Duane Morris LLP, her attorneys, with approximately $13,608 from the HELOC. CRUPI and BOWEN also used the HELOC to make approximately $68,250 in payments on another line of credit held by CRUPI at BOA.

125.   CRUPI and BOWEN further drained the equity out of the Westfield Property by drawing on the HELOC to make deposits into the 0624 Account.  For instance, on or about October 22, 2007, a check for approximately $25,000 drawn on the HELOC was deposited in the 1268 Account and then transferred to the 0624 Account.

126.   Expenses that CRUPI or BOWEN could have met using their respective salaries were instead used to further diminish the equity built up in the Westfield Property, which had been paid for with fraud proceeds.

127.    The line of credit on the HELOC was increased in or about April 2011.  As of April 8, 2013, the outstanding principal balance was approximately $588,530.40.

128.    The Westfield Property was appraised on or about December 15, 2009, for approximately $885,000.

(d)    The 0624 Account

129.    Account No. 785-870624 at TD Ameritrade — the 0624 Account — was opened on or about November 1, 2006, in BOWEN's name.  BOWEN gave her occupation as "homemaker" and stated that she had no dependents.  BOWEN categorized her knowledge of investments as "good."  The 0624 Account was registered for investment in cash, trading in stocks and bonds and the purchase of options.

130.    On or about January 17, 2007, CRUPI was added as a co-owner of the 0624 Account.  On the Account Modification Form, CRUPI listed her occupation at BLMIS as "Office Manager."  She stated she had four dependents.  CRUPI placed her investment knowledge in the "extensive" category, and registered the account for investment in cash, trading in stocks and bonds, and the purchase of options.

131.    On or about April 29, 2007, CRUPI and BOWEN removed CRUPI's name as a co-owner of the 0624 Account, leaving BOWEN as the sole owner.  On the Account Modification Form, BOWEN stated that she earned approximately $20,000-50,000 a year working part-time, that her approximate net worth and liquid net worth totaled at least $500,000, and that she had no dependents.  BOWEN again categorized her investment knowledge as "good."  However, in the section of the form asking what type of trading activity she intended to conduct in her options account, BOWEN checked off all four available categories, indicating that

she planned to write covered calls, purchase options, create spreads, and write uncovered options.

132.   The 0624 Account was substantially funded with transfers or deposits from BLMIS. In a number of instances, the transfers from BLMIS passed through the 1268 Account or the 9338 Account before being deposited in the 0624 Account. For instance:

a.   The 0624 Account was initially funded with a transfer of $35,000 from the 1268 Account. Just two days earlier, $60,000 had been transferred into the 1268 Account from the IA Bank Account.

b.   On or about January 24, 2007, approximately $50,000 was transferred from the 1268 Account to the 0624 Account.

c.   On or about November 22, 2006, approximately $194,013 was transferred from the IA Bank Account to the 9338 Account. From on or about November 24, 2006 to January 4, 2007, in approximately six different transactions, approximately $146,000 was transferred from the 9338 Account to the 0624 Account.

d.   On or about January 11, 2007, approximately $20,000 was transferred from the IA Bank Account to the 1268 Account. The following day, the $20,000 was transferred to the 0624 Account.

e.   From in or about February 2007 to in or about December 2008, a total of approximately $52,350 was transferred to the 0624 Account from a BLMIS Account at The Bank of New York.

f.   On or about October 17, 2008, a $75,000 check written on the HELOC on the Westfield Property was deposited into the 0624 Account. Less than a week later, however, CRUPI covered this withdrawal, and then some, by paying down $340,000 of the HELOC with a BLMIS check drawn on the IA Checking Account, referencing a "BLM Special" account.

133.   Significant transfers have been made from the 0624 Account to the 1268 Account and the 9338 Account, the checking accounts used by CRUPI and BOWEN. For example:

a.   From in or about April 2009 to October 2009, approximately $115,000 was transferred from the 0624 Account to the 1268 Account.

37

b.   From in or about January 2009 to in or about June 2011, approximately $158,000 was transferred from the 0624 Account to the 9338 Account, in amounts ranging from $4,000 to $25,000.

134.   As of February 8, 2013, the market value of the 0624 Account was approximately $121,746.44, comprised of investments including stocks, money market and mutual funds.  The cost basis of the account was $101,510, with the difference being unrealized gains, interest and/or dividends.

(e)   **The 5391 IRA Account**

135.   On or about January 17, 2007, CRUPI opened Individual Retirement Account ("IRA") No. 786-065391 at TD Ameritrade (the "5391 Account").  On the application, CRUPI stated that she was employed by BLMIS as an "Office Manager."

136.   CRUPI funded the 5391 Account with a rollover of approximately $96,254 held in an IRA account administered by Pensco Trust Company but custodied, purportedly, at BLMIS.  At the time of the collapse of BLMIS, this account — CRUPI IA Account No. 1-C1277 — had a cumulative (negative) balance of approximately -$322,687 as a result of withdrawals that exceeded purported deposits or credits.

137.   As of February 8, 2013, the 5391 Account was invested solely in securities and had a value of approximately $166,733.56.

(f)   **The Mantoloking Property**

138.   In or about May 2008, CRUPI and BOWEN made an offer on a single-family home located at 1081 Barnegat Lane, Mantoloking, New Jersey.  Their offer of $2,225,000 in cash — only $100,000 under the asking price — was quickly accepted.

139.    On or about May 31, 2008, CRUPI and BOWEN, as co-buyers, signed a Contract of Sale for the Mantoloking Property and put down a $5,000 deposit on the property (which was later refunded).

140.    The Contract of Sale provided that after the $5,000 initial deposit, the buyers would put a further deposit of $440,000 in escrow ten days from the attorney review period, and would pay the balance on or before the closing date. The closing was initially set for June 30, 2008, but was changed by the seller to "on or before" January 20, 2009.

141.    On or about June 25, 2008, CRUPI paid the second deposit on the property with a $475,000 wire transfer from the IA Bank Account. On the Daily Report, which CRUPI prepared or reviewed, the $475,000 was listed in the column for outgoing wire activity with the notation "out - GUSTON (BLM)."

142.    The $475,000 was transferred to an account at Commerce Bank (now TD Bank) held by Guston & Guston, LLP ("Guston"), the law firm that represented CRUPI and BOWEN in connection with the purchase.  Guston used that particular account for the deposit of funds it was holding for clients on a short-term basis (the "Guston IOLTA Account").

143.    After the closing was delayed to January 2009, the $475,000 deposit was transferred from the Guston IOLTA Account to an interest-bearing money market account that Guston opened at TD Bank on July 3, 2008 "as trustee for Jo Ann Crupi." CRUPI's social security number was listed on the account.

144.    On or about October 16, 2008, CRUPI caused additional funds, in the amount of $2,225,000, to be wire transferred from the IA Bank Account to the Guston IOLTA Account. On the Daily Report, which CRUPI prepared or reviewed, the $2,225,000 wire transfer was listed in the column for outgoing wire activity with the notation "out - BLM SP."

145.    After Guston received the $2,225,000, it no longer needed the second deposit of $475,000, which Guston was holding in escrow. On or about October 20, 2008, Guston wire transferred the $475,000, plus interest, for a total of $480,000, to the IA Bank Account, but these funds made their way back to CRUPI and BOWEN through a series of wire transfers accompanied by purported "credits" and "debits" to CRUPI and BOWEN's IA Accounts. Specifically:

    a.    On or about October 20, 2008, when Guston transferred the $480,000 to the IA Bank Account, the funds were treated as a credit to CRUPI IA Account No. 1-C1210.

    b.    On or about November 3, 2008 — when requests for redemption were nearly three times greater than the balance in the IA Bank Account — CRUPI caused a "transfer" of $1,200,000 from IA Account No. 1-C1210 to an IA account held in BOWEN's name.

    c.    On or about November 5, 2008, a "withdrawal" of $742,000 was posted to the BOWEN IA Account, and $742,000 was wired from the IA Bank Account to BOWEN's checking account — the 9338 Account.

146.    On or about October 31, 2008, a check in the amount of $500,000 written on the Guston IOLTA Account was used to purchase a Certificate of Deposit ("CD") at Valley National Bank held by Guston as trustee for BOWEN. (The $500,000 principal, plus interest ($501,462) was transferred on or about December 31, 2008 back to the Guston IOLTA Account in preparation for closing).

147.    On or about October 31, 2008, a check in the amount of $500,000 written on the Guston IOLTA Account was deposited into an interest-bearing account at Bank of America held by Guston as trustee for CRUPI and BOWEN.

148.   On or about November 25, 2008, CRUPI and/or BOWEN caused Guston to establish new interest-bearing trust accounts so that BOWEN would appear to be the sole beneficial owner of the $2,225,000.  Specifically:

 a. On or about November 25, 2008, Guston wrote a check for $745,000 on its IOLTA Account bearing the notations "Bowen 1" and "transfer to MM [money market] account."  The check was used to open a money market account on November 25, 2008 at TD Bank held in the name of "Judith G. Bowen, Guston & Guston LLP, Trustee" (the "901 Account").

 b. On or about November 26, 2008, the $500,000 being held at BOA by Guston in trust for CRUPI and BOWEN, plus interest of $915, was transferred to the 901 Account.

 c. On or about November 25, 2008, the money market account at TD Bank opened by Guston on July 3 as trustee for CRUPI was closed, and the account balance, approximately $485,182, was deposited into the 901 Account.

149.   In or about early November 2008, pursuant to an agreement with the seller, CRUPI and BOWEN took possession of the Mantoloking Property.

150.   Beginning on or about December 31, 2008, the interest-bearing escrowed funds were transferred to the Guston IOLTA Account in anticipation of closing.  Specifically:

 a. On or about December 31, 2008, the Valley National Bank CD was liquidated and the proceeds, approximately $501,462, were transferred to the Guston IOLTA Account.

 b. On or about January 6, 2009, the balance of the 901 Account — approximately $1,735,217 — was transferred to the Guston IOLTA Account.

151.   According to the Contract of Sale and correspondence between and among the attorneys and realtors, the purchasers of the Mantoloking Property were CRUPI and BOWEN.  However, when the deed was signed on January 2, 2009 (and recorded on February 10, 2009), title to the Mantoloking Property was put in BOWEN's name only.

41

152.    The purchase of the Mantoloking Property, including approximately $2,094,754 paid to the seller and $111,250 in real estate commissions, was funded by the $2,225,000 transferred from the IA Bank Account to the Guston IOLTA Account on or about October 16, 2008, and funds traceable to this transfer.

153.    Other obligations incurred in connection with the purchase of the Mantoloking Property were also paid with funds traceable to BLMIS, such as a $22,250 payment to the State of New Jersey (for a tax imposed on the buyer of residential real property purchased for more than $1,000,000 equivalent to 1% of the purchase price), and a $13,005 tax payment to the Ocean County Clerk.

154.    The Mantoloking Property was appraised on or about December 17, 2009, for approximately $2,110,000.

(g)    **The 2792 Account**

155.    On or about July 27, 2009, BOWEN opened checking Account No. 7870002792 at TD Bank (the "2792 Account") in her own name.  BOWEN has used the account principally to deposit the rental proceeds from, and to pay expenses in connection with, the Mantoloking Property.  Approximately $48,350 in rental proceeds have been deposited into the 2792 Account in 2010 and 2011.

156.    Not long after the closing of the Mantoloking Property — and the collapse of BLMIS — in about January 22, 2009, BOWEN began corresponding with a realtor regarding the rental of the Mantoloking Property during the summer of 2009.

157.    As a result of lease agreements entered into by BOWEN for the rental of the Mantoloking Property for the periods from on or about July 16, 2009 to on or about August 8,

2009, and from August 15 to 22, 2009, rental proceeds totaling approximately $23,272 were deposited into the 2792 Account.

158.   In 2010, the Mantoloking Property was leased for the period from August 7 to 21, and $6,500 in rental payments was deposited into the 2792 Account.

159.   In 2011, BOWEN executed at least three agreements for the rental of the Mantoloking Property during the summer season.  The total rental proceeds, exclusive of commission, were approximately $25,500 for June 30 to August 6, 2011; $11,000 for August 6 to 20, 2011; and $10,000 for August 20 to September 5, 2011, for a total of approximately $41,500.  BOWEN deposited at least $27,000 of this money into the 2972 Account.

160.   As of February 6, 2013, the balance of the 2792 Account was approximately $26,118.48.

(h)   **Certain Funds Held on Account for CRUPI by Duane Morris LLP**

161.   The property traceable to funds CRUPI and BOWEN received, directly and indirectly, from BLMIS includes at least $143,586 transferred to Duane Morris LLP, 744 Broad Street, Newark, NJ, 07102-3889 ("Duane Morris"), from the above-described Defendant in rem accounts and assets associated with CRUPI and/or BOWEN.  Duane Morris is the law firm that represents CRUPI and BOWEN in connection with BLMIS-related matters, including CRUPI's criminal defense, CRUPI and BOWEN's claims in this action, and CRUPI and BOWEN's defense in a civil action file by the liquidating trustee for BLMIS.  For example:

   a.   On or about January 7, 2009, a check in the amount of $15,000 drawn on the 9338 Account was written to Duane Morris with the memo "Jo Ann Crupi retainer."

   b.   Between April and July 2009, a total of approximately $49,850 was transferred to Duane Morris from CRUPI's 1268 Account.

c.   Between August and October 2009, a total of approximately $8,568 was transferred to Duane Morris from the 9338 Account.

d.   In November 2009 and January 2010, two checks totaling approximately $9,198 were written to Duane Morris on the 1268 Account.

e.   On or about January 27, 2010, a check for $1,092 drawn on the 9338 Account was written to Duane Morris.

f.   From March 1 to June 24, 2010, checks totaling approximately $20,457 were written to Duane Morris on CRUPI's 1268 Account.

g.   On or about September 8 and 27, 2010, checks drawn on the HELOC on the Westfield Property, in the amounts of $8,108.15 and $5,500, respectively, were paid to Duane Morris.

h.   Two checks drawn on the 1268 Account, totaling approximately $5,800, were written to Duane Morris in July and October, 2010.

i.   On or about December 3, 2010, a check for $20,000 drawn on the 9338 Account was written to Duane Morris.

162.   On or about December 21, 2010, the Government sent a letter to Duane Morris reminding the firm that the forfeiture allegation in the S2 superseding indictment sought a money judgment of at least $154.5 billion against CRUPI and the Government also had filed a related civil forfeiture action containing allegations relating to property nominally belonging to CRUPI and/or BOWEN, including funds on deposit at TD Bank. In the letter, the Government further stated that its investigation had revealed that the only meaningful source of income that CRUPI received over the past three and a half decades came from BLMIS. The Government requested that counsel "freeze" any money or property sent to them by CRUPI and/or BOWEN and refrain from drawing down against any more such funds as payment to the firm. The Government further requested an accounting showing any funds counsel believed were earned but undrawn as of the date of receipt of the letter.

163.   Accordingly, any funds provided by CRUPI and/or BOWEN in the possession or under the control of Duane Morris as of December 21, 2010 — with the exception of those funds that had been earned as of that date, but not yet drawn as payment for costs or services already rendered — are subject to forfeiture to the United States.

## FIRST CLAIM
## (FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(C))

164.   The Government incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

165.   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense," is subject to forfeiture to the Government.

166.   "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, any offense listed under 18 U.S.C. § 1961(1).  Section 1961(1) lists offenses that constitute "racketeering activity" for purposes of the RICO statute, and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and "fraud in the sale of securities."

167.   Pursuant to 18 U.S.C. § 981(a)(2)(A), for purposes of the civil forfeiture statutes in cases involving "unlawful activities," "proceeds" refers to "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."

168.   The Defendants in rem constitute property traceable to the proceeds of the fraud perpetrated through BLMIS, and property traceable to such property, and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

SECOND CLAIM
(FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(A))

169.    The Government incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

170.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture to the Government.

171.    18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A)    (i)  with the intent to promote the carrying on of specified unlawful activity; or

(ii)  with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B)    knowing that the transaction is designed in whole or in part –

(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii)  to avoid a transaction reporting requirement under State or Federal law[.]

172.    Section 1956(a)(2) further imposes a criminal penalty on any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States –

(A)     with the intent to promote the carrying on of specified unlawful activity; or

(B)     knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part –

(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii)  to avoid a transaction reporting requirement under State or Federal law[.]

173.    Pursuant to 18 U.S.C. § 1956(a)(3), "[w]hoever, with the intent – (A) to promote the carrying on of specified unlawful activity; (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or (C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity," commits a crime under federal law.

174.    18 U.S.C. § 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction [in the United States] in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." A "monetary transaction" includes the "deposit, withdrawal, transfer, or exchange, in or affecting

interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1).

175.   Pursuant to 18 U.S.C. § 1956(h), "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

176.   For purposes of Sections 1956 and 1957, "specified unlawful activity" has the same meaning as set forth in paragraph 148 above, and includes, among other things, mail fraud, wire fraud, and fraud in the sale of securities.

177.   The Defendants in rem constitute property involved in money laundering transactions and attempted money laundering transactions in violation of Sections 1956 and 1957 and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

THIRD CLAIM
(CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(a)(1)(A) and (b))

178.   The United States incorporates by reference paragraphs 1 through 163 and 169 through 177 above as if fully set forth herein.

179.   Pursuant to Title 18, United States Code, Section 1956(b), "[w]hoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of – (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

180.   CRUPI and BOWEN engaged in financial transactions involving funds obtained from defrauded investors of the BLMIS IA operation or funds traceable to such funds, and therefore involving the proceeds of specified unlawful activity within the meaning of the money laundering statute.

181.    CRUPI and BOWEN knew that Madoff and BLMIS was a fraud and that payments from BLMIS were the proceeds of unlawful conduct.

182.    CRUPI and BOWEN further acted with the intent of promoting and perpetuating Madoff's acts of securities fraud, mail fraud, wire fraud, and money laundering, and to aid Madoff in promoting and concealing his money laundering.

183.    Accordingly, CRUPI and BOWEN are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

## FOURTH CLAIM
### (CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(a)(1)(B) and (b))

184.    The United States incorporates by reference paragraphs 1 through 163 and 169 through 183 above as if fully set forth herein.

185.    CRUPI and BOWEN engaged in financial transactions involving funds obtained from defrauded investors of the BLMIS IA operation or funds traceable to such funds, and therefore involving the proceeds of specified unlawful activity within the meaning of the money laundering statute.

186.    CRUPI and BOWEN knew that Madoff and BLMIS was a fraud and that payments from BLMIS were the proceeds of unlawful conduct.

187.    CRUPI and BOWEN also knew that the financial transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Madoff and BLMIS's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering.

188.   Accordingly, CRUPI and BOWEN are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

## FIFTH CLAIM
## (CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(b) and 1957)

189.   The United States incorporates by reference paragraphs 1 through 163 and 169 through 183 above as if fully set forth herein.

190.   CRUPI and BOWEN knowingly engaged in monetary transactions involving funds obtained from defrauded investors of the BLMIS IA operation or funds traceable to such funds, and therefore involving criminally derived property which was derived from specified unlawful activity within the meaning of the money laundering statute.

191.   Such transactions were made by, through, and to financial institutions and involved property of a value greater than $10,000.

192.   Accordingly, CRUPI and BOWEN are liable to the United States for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

## SIXTH CLAIM
## (CIVIL MONEY LAUNDERING PENALTIES, 18 U.S.C. §§ 1956(h) and (b))

193.   The United States incorporates by reference paragraphs 1 through 163 and 169 through 183 above as if fully set forth herein.

194.   From at least the early 1980s, through on or about December 11, 2008, Madoff, BLMIS, and CRUPI and BOWEN unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate 18 U.S.C. §§ 1956(a)(1)(A), (a)(1)(B), (a)(2)(A), (a)(2)(B), and 1957.