195.   It was a part and an object of the conspiracy that CRUPI and BOWEN and BLMIS engaged in financial transactions that involved the proceeds of the BLMIS Ponzi scheme in order to promote Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering.

196.   It was a further part and object of the conspiracy that CRUPI and BOWEN and BLMIS engaged in financial transactions in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering.

197.   It was a further part and object of the conspiracy that BLMIS would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering.

198.   It was a further part and object of the conspiracy that BLMIS would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering.

199.   It was a further part and object of the conspiracy that CRUPI and BOWEN and BLMIS conducted and attempted to conduct financial transactions involving property represented to be the proceeds of Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering, or property used to conduct or facilitate Madoff's underlying acts

of securities fraud, mail fraud, wire fraud, and money laundering, with the intent (a) to promote the carrying on of Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering, (b) to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering; and (c) to avoid transaction reporting requirements under State and Federal law.

200.    It was a further part and object of the conspiracy that CRUPI and BOWEN and BLMIS engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000, and which was derived from Madoff's underlying acts of securities fraud, mail fraud, wire fraud, and money laundering.

201.    Accordingly, CRUPI and BOWEN are liable to the United States for the value of the funds and monetary instruments involved in the conspiracy, in an amount to be determined at trial.

### SEVENTH CLAIM
### (CONVERSION)

202.    The United States incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

203.    All funds received by CRUPI and/or BOWEN from BLMIS are the lawful property of the United States of America.

204.    CRUPI and BOWEN knowingly converted these funds for their own use, in derogation of the rights of the United States, which is entitled to these funds.

205.    As a result of the conversion by CRUPI and BOWEN, the United States has been damaged in an amount to be determined at trial, which shall in no case be less than the difference between the value of funds received by CRUPI and/or BOWEN from BLMIS, on the one hand,

and the value of the Defendants in rem actually recovered by the United States pursuant to the First and Second Claims, above, on the other hand.

## EIGHTH CLAIM
## (UNJUST ENRICHMENT)

206.    The United States incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

207.    BLMIS made payments to CRUPI and BOWEN when they were not entitled to those payments, from funds forfeitable to, and thus the property of, the United States.

208.    CRUPI and BOWEN have been unjustly enriched by retaining the use and enjoyment of the BLMIS payments, to which they were not entitled.

209.    CRUPI and BOWEN have been unjustly enriched in an amount to be determined at trial, which shall in no case be less than the difference between the value of funds received by CRUPI and/or BOWEN from BLMIS to which they were not entitled, on the one hand, and the value of the Defendants in rem actually recovered by the United States pursuant to the First and Second Claims, above, on the other hand.

210.    The circumstances of CRUPI and BOWEN's receipt of these payments from BLMIS are such that, in equity and good conscience, CRUPI and BOWEN should not retain these payments.

## NINTH CLAIM
## (ACTUAL FRAUDULENT TRANSFERS UNDER 28 U.S.C. § 3304((b)(1)(A): TRANSFERS FROM MADOFF TO CRUPI AND/OR BOWEN BEFORE DECEMBER 11, 2008)

211.    The United States incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

212.    Bernard L. Madoff made the transfers from BLMIS to CRUPI and/or BOWEN described herein with actual intent to hinder, delay, or defraud one or more of his creditors, including the United States.

213.    The transfers from Madoff, through BLMIS, to CRUPI and/or BOWEN prior to on or about December 11, 2008, described herein were thus fraudulent as to Madoff's debts to the United States, and should be set aside and declared void to the extent necessary to satisfy Madoff's debts to the United States, or, in the alternative, judgment should be entered against CRUPI and BOWEN for the value of the assets transferred.

## TENTH CLAIM
### (CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 28 U.S.C. § 3304(b)(1)(B): TRANSFERS FROM MADOFF TO CRUPI AND/OR BOWEN BEFORE DECEMBER 11, 2008)

214.    The United States incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

215.    Bernard L. Madoff did not receive reasonably equivalent value in exchange for the transfers from BLMIS to CRUPI and/or BOWEN described herein.

216.    The transfers from BLMIS to CRUPI and/or BOWEN described herein were made a time when Madoff either intended to incur, or reasonably believed that he would incur debts beyond his ability to pay as they became due.

217.    The transfers from BLMIS to CRUPI and/or BOWEN described herein were thus fraudulent as to Madoff's debts to the United States, and should be set aside and declared void to the extent necessary to satisfy Madoff's debts to the United States, or, in the alternative, judgment should be entered against CRUPI and BOWEN for the value of the assets transferred.

### ELEVENTH CLAIM
### (ACTUAL FRAUDULENT TRANSFERS UNDER 28 U.S.C. § 3304((b)(1)(A): TRANSFERS AMONG CRUPI AND BOWEN AFTER DECEMBER 11, 2008)

218.    The United States incorporates by reference paragraphs 1 through 163 above as if fully set forth herein.

219.    CRUPI and BOWEN made the transfers between and among themselves and their related entities after on or about December 11, 2008, described herein with actual intent to hinder, delay or defraud one or more of their creditors, including the United States.

220.    The transfers after on or about December 11, 2008, described herein were thus fraudulent as to CRUPI and BOWEN's debts to the United States, and should be set aside and declared void to the extent necessary to satisfy CRUPI and BOWEN's debts to the United States, or, in the alternative, judgment should be entered against CRUPI and BOWEN for the value of the assets transferred.

### REQUEST FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered as follows:

A.      Enter judgment against the Defendants in rem, and in favor of the United States, on the first and second claims alleged in the Complaint.

B.      Issue process to enforce the forfeiture of the Defendants in rem, requiring that all persons having an interest in the Defendants in rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants in rem to the United States of America for disposition according to law;

C.  Enter judgment against CRUPI and BOWEN, and in favor of the United States, on the third through eleventh claims alleged in the Complaint.

D.  Award the United States civil money laundering penalties from CRUPI and BOWEN on the third through sixth claims alleged in the Complaint, in an amount to be proven at trial to a jury, plus prejudgment and postjudgment interest.

E.  Award the United States damages from CRUPI and BOWEN for conversion and unjust enrichment on the seventh and eighth claims alleged in the Complaint, in an amount to be proven at trial to a jury, plus prejudgment and postjudgment interest.

F.  Enter a judgment on the ninth, tenth, and, eleventh claims alleged in the Complaint declaring that the transfers described herein were fraudulent as to debts to the United States pursuant to 28 U.S.C. §§ 3304(b)(1)(A) and/or 3304(b)(1)(B).

G.  Enter a judgment on the ninth, tenth, and, eleventh claims alleged in the Complaint voiding the transfers described herein to the extent necessary to satisfy any debt to the United States pursuant to 28 U.S.C. § 3306(a)(1).

H.  Award the United States damages from CRUPI and BOWEN on ninth, tenth, and, eleventh claims alleged in the Complaint in an amount equal to the value of the assets transferred, as described herein, pursuant to 28 U.S.C. §§ 3306(a)(2) and 3307(b).

I.  Enter a judgment on the ninth, tenth, and, eleventh claims alleged in the Complaint granting any other remedies under the FDCPA, including attachment, receivership, or sequestration of any fraudulently conveyed property pursuant to 28 U.S.C. § 3306(a)(2).

J.      Grant any other relief the circumstances may require, pursuant to 28 U.S.C.

§ 3306(a)(3), or as the Court deems appropriate.

K.      Grant the Government such further relief as this Court may deem just and proper,

together with the costs and disbursements in this action.

Dated:  New York, New York
        May 30, 2013

PREET BHARARA
United States Attorney
Attorney for the United States of America

MATTHEW L. SCHWARTZ
PAUL M. MONTELEONI
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone:  (212) 637-1945/2219
Facsimile:  (212) 637-0421
E-mail:  matthew.schwartz@usdoj.gov
         paul.monteleoni@usdoj.gov

VERIFICATION

STATE OF NEW YORK                      )
COUNTY OF NEW YORK                     :
SOUTHERN DISTRICT OF NEW YORK  )

Gregory A. Coleman, being duly sworn, deposes and says that he is a Special Agent with

the Federal Bureau of Investigation, and as such has responsibility for the within action; that he

has read the foregoing Amended Verified Complaint and knows the contents thereof, and that the

same is true to the best of his knowledge, information, and belief.

The sources of deponent's information and the ground of his belief are official records

and files of the United States, information obtained directly by the deponent, and information

obtained by other law enforcement officials and representatives during an investigation of

alleged violations of Titles 15 and 18, United States Code.

Gregory A. Coleman
Special Agent
Federal Bureau of Investigation

Sworn to before me this
30th day of May, 2013:

NOTARY PUBLIC

LILLIE A. GRANT
Notary Public, State of New York
No. 24-4758214
Qualified in Kings County
Certificate Filed in New York County
Commission Expires January 17, 2015

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

     -v-                        :

DANIEL BONVENTRE,               :
ANNETTE BONGIORNO,
JOANN CRUPI,                    :
    a/k/a "Jodi,"
JEROME O'HARA, and              :
GEORGE PEREZ,
                                :
     Defendants.
                                :

- - - - - - - - - - - - - - - x

**ORIGINAL**

<u>INDICTMENT</u>

S8 10 Cr. 228 (LTS)



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 01 2012

<u>COUNT ONE</u>

(Conspiracy to Commit Securities Fraud, to Falsify Records of
a Broker-Dealer, to Falsify Records of an Investment Adviser,
and to Commit Mail Fraud)

The Grand Jury charges:

<u>Relevant Persons and Entities</u>

1.   At all times relevant to this Indictment, Bernard

L. Madoff Investment Securities LLC, and its predecessor, Bernard

L. Madoff Investment Securities (collectively and separately,

"BLMIS"), had its principal place of business in New York, New

York.  BLMIS was a broker-dealer that engaged in three principal

types of business operations: Market Making; Proprietary Trading;

and Investment Advisory ("IA") services.  BLMIS was registered

with the United States Securities and Exchange Commission ("SEC")

as a broker-dealer since in or about 1960 and as an investment

adviser since in or about August 2006.

2.     As a registered broker-dealer and as an investment adviser, BLMIS was required to make and keep certain books and records in its ordinary course of business.

3.     At all times relevant to this Indictment, Madoff Securities International Ltd. ("MSIL") was a corporation incorporated in the United Kingdom.  MSIL was an affiliate of BLMIS that engaged principally in proprietary trading.

4.     Bernard L. Madoff ("Madoff") was the founder of BLMIS and served as its sole member and principal.  In that capacity, Madoff controlled the business activities of BLMIS. Madoff owned the majority of the voting shares of MSIL and served as the Chairman of MSIL's Board of Directors.  At the time of its collapse in December 2008, BLMIS managed more than 4,000 Investment Advisory accounts purporting to have a cumulative balance of approximately $65 billion.  While Madoff promised to clients and prospective clients that he would invest their money in shares of common stock, options, and other securities of well-known corporations, he never invested the client funds in the securities as he had promised.

5.     DANIEL BONVENTRE, the defendant, was employed by BLMIS from in or about August 1968, through at least on or about December 11, 2008.  BONVENTRE began working at BLMIS as an auditor, and subsequently was given increasing responsibility for supervising the back-office operations of BLMIS.  Since at least

the 1980s, BONVENTRE served in the position of "Director of Operations" for BLMIS in which he was responsible for, among other things: (a) maintaining and supervising the production of the principal internal accounting documents for BLMIS, including the General Ledger ("G/L"); (b) maintaining the Stock Record for BLMIS and resolving any discrepancies between internal and external records; (c) supervising the use and reconciliation of BLMIS bank accounts through which the Market Making, Proprietary Trading, and Investment Advisory business operations were funded; (d) supervising BLMIS employees who worked in the accounting department and the "cage";[1] and (e) supervising JEROME O'HARA and GEORGE PEREZ, the defendants, insofar as their work related to the production of the G/L and other BLMIS accounting records.

6.   Frank DiPascali, Jr. ("DiPascali") was employed at BLMIS between in or about 1975, and on or about December 11, 2008.  During his employment at BLMIS, DiPascali had a variety of duties and responsibilities.  By the early 1990s, DiPascali was one of the BLMIS employees responsible for managing the majority of BLMIS's IA accounts into which thousands of BLMIS clients invested, and eventually lost, billions of dollars. Specifically, DiPascali managed the IA accounts that were

---

[1]     The "cage" was the area of BLMIS's office in which settlement and clearing functions occurred, and in which checks and wire transfers were sent and/or received.

invested in the "split strike conversion" strategy, as described below.

7.    ANNETTE BONGIORNO, the defendant, was employed at BLMIS from in or about 1968, through at least on or about December 11, 2008.  During her employment, BONGIORNO had a variety of duties and responsibilities, including managing hundreds of IA accounts purportedly having a cumulative balance of approximately $8.5 billion dollars as of November 30, 2008.  BONGIORNO also supervised employees who worked for the IA business.

8.    Peter Madoff ("Peter Madoff") was employed at BLMIS from in or about 1965, through on or about December 11, 2008, during which time he held a variety of positions.  From approximately 1969 through December 11, 2008, Peter Madoff, an attorney, was the Chief Compliance Officer ("CCO") and Senior Managing Director at BLMIS.  Peter Madoff also was the head trader in BLMIS's Market Making and Proprietary Trading operations for many years.  Peter Madoff was a director of MSIL, the London affiliate of BLMIS, and also was a part owner of Cohmad Securities Corp. ("Cohmad Securities"), a related entity that, among other things, solicited Investment Advisory clients on behalf of BLMIS.

9.    David L. Kugel ("David Kugel") was employed at BLMIS beginning from in or about 1970, through at least on or

4

about December 11, 2008.  Since in or about 1970, David Kugel was

a trader in BLMIS's Proprietary Trading and Market Making

operations.

      10.   JOANN CRUPI, a/k/a "Jodi," the defendant, was

employed at BLMIS from in or about 1983, through at least on or

about December 11, 2008.  During her employment at BLMIS, CRUPI

had a variety of duties and responsibilities, including tracking

the daily activity of the bank account into which billions of

dollars of IA client money was deposited, and from which IA

client redemptions were paid (the "IA Bank Account"), and

directing wire transfers into and out of the IA Bank Account.  In

addition, CRUPI managed several BLMIS IA accounts purportedly

having a cumulative balance of approximately $900 million as of

November 30, 2008.  CRUPI also assisted DiPascali in managing the

split strike conversion ("Split Strike") accounts.

      11.   David G. Friehling ("Friehling"), was a licensed

Certified Public Accountant ("CPA") with Friehling & Horowitz,

CPAs, P.C. ("F&H").  From in or about 1991 through 2008, F&H was

the accounting firm retained by BLMIS purportedly to audit

BLMIS's financial statements.  Friehling was the tax accountant

for Madoff beginning in at least 1991 through 2008.  Friehling

also was the tax accountant for Peter Madoff, and other Madoff

family members.

12.   Enrica Cotellessa-Pitz ("Cotellessa-Pitz") was
employed by BLMIS from in or about 1978, through at least on or
about December 11, 2008.  In or about 1998, Cotellessa-Pitz
became the Controller of BLMIS.  Cotellessa-Pitz reported to
DANIEL BONVENTRE, the defendant, and assisted BONVENTRE in
maintaining the books and records of BLMIS, including the General
Ledger and the Stock Record, and BLMIS's bank accounts.

13.   JEROME O'HARA and GEORGE PEREZ, the defendants,
were employed by BLMIS starting in or about 1990 and 1991,
respectively.  O'HARA and PEREZ were each responsible for, among
other things, developing and maintaining computer programs for
computers that supported the operations of BLMIS, including its
Market Making, Proprietary Trading, and Investment Advisory
operations.

14.   Eric S. Lipkin ("Lipkin") was employed by BLMIS
from in or about the mid-1980s, through at least on or about
December 11, 2008.  Lipkin was a member of the Investment
Advisory staff who worked under the supervision of DiPascali and
also was the payroll manager at BLMIS.

15.   Craig Kugel ("Craig Kugel") was employed at BLMIS,
or its affiliated entity Primex Trading LLC ("Primex"), from in
or about 2001, through at least on or about December 11, 2008.
At Primex, Craig Kugel worked under the direct supervision of
Peter Madoff.  Craig Kugel's responsibilities included, among

6

other things, budget forecasting for BLMIS's Market Making and Proprietary Trading operations and overseeing BLMIS's health care plan.

## Background

A.   **The Ponzi Scheme**

16.   From at least as early as the 1970s through on or about December 11, 2008, Madoff and other co-conspirators perpetrated a scheme to defraud the clients of the BLMIS IA business ("IA Clients") by accepting billions of dollars of IA Client funds under false pretenses, failing to invest the IA Client funds as promised, creating and disseminating false and fraudulent documents to IA Clients purporting to show that their funds had been invested, creating false books and records of BLMIS, and lying to the SEC and an accounting firm to conceal the fraudulent scheme.

17.   To execute the scheme, Madoff solicited, and caused others to solicit, prospective clients to open trading accounts with BLMIS, based upon, among other things, a promise to use investor funds to purchase shares of common stock, options, other securities, and financial instruments, and representations that he would achieve high rates of return with limited risk. These representations were false.  Contrary to representations made on account statements and other documents sent to IA Clients, Madoff and other co-conspirators knew that the IA Client

funds were not being invested in securities as promised.
Moreover, Madoff and other co-conspirators misappropriated IA
Client funds and converted those funds to their own use and the
use of others.

B.   The Arbitrage Investment Strategy

18.   From approximately the early 1970s until
approximately the mid- to late 1990s, BLMIS purported to utilize
an arbitrage investment strategy in BLMIS's IA operations.   As a
general matter, arbitrage describes a variety of trading
strategies that seek to exploit pricing errors in the market.
The arbitrage strategy had been used in BLMIS's Proprietary
Trading operation in connection with actual trading activity.
Beginning in at least the early 1970s, BLMIS used a purported
arbitrage trading strategy in IA Client accounts.   These
arbitrage trades were a fiction and were "executed" only on
paper, that is, no actual trades were ever executed but IA
Clients nevertheless were sent documentation reflecting that the
trades had occurred.   At Madoff's request, beginning in or about
the early 1970s, David Kugel helped create fake, backdated
arbitrage trades for purposes of defrauding IA Clients.   David
Kugel provided historical trade information to ANNETTE BONGIORNO,
JOANN CRUPI, a/k/a "Jodi," the defendants, and others which
enabled them to create fake trades that, when included on the
account statements and trade confirmations of IA Clients, gave

the appearance of profitable trading when in fact no trading had actually occurred.  David Kugel, BONGIORNO, CRUPI and others created these fake, backdated trades based on historical stock prices and "executed" them only on paper.

C.   The "Split Strike" Investment Strategy

19.   Beginning in or about the early 1990s, under the direction of Madoff, DiPascali helped to develop the purported Split Strike investment strategy that Madoff used to market the IA business to IA Clients and prospective IA Clients.  Current and prospective IA Clients who were invested in the Split Strike strategy were promised that: (i) their funds would be invested in a basket of approximately 35-50 common stocks within the Standard & Poor's 100 Index (the "S&P 100"), a collection of the 100 largest publicly traded companies in terms of their market capitalization; (ii) the basket of stocks would closely mimic the price movements of the S&P 100; (iii) the investments would be hedged by using IA Client funds to buy and sell option contracts related to those stocks, thereby limiting potential losses caused by unpredictable changes in stock prices; (iv) Madoff opportunistically would time the entry and exit from the strategy; and (v) when the IA Client funds were not invested in the basket of stocks and options described above, those funds would be invested in money market funds and United States

Government-issued securities such as United States Treasury
bills.

20.   In total, thousands of IA Clients, including
individual investors, charitable organizations, trusts, pension
funds, and hedge funds, among others, with billions of dollars of
cumulative investments, were told by Madoff and other co-
conspirators that their funds were invested with BLMIS using the
Split Strike strategy.   (These clients are herein referred to,
collectively, as the "Split Strike Clients.")

21.   Madoff and other co-conspirators knew that the
Split Strike strategy was a fiction in that the Split Strike
Clients' funds were not invested in the securities recorded on
those clients' account statements.   The reported performance of
the Split Strike strategy was fabricated by Madoff, DiPascali,
and other co-conspirators through a process in which transactions
were "executed" only on paper, based on historically reported
prices of securities, for the purpose of producing and sending
documents to Split Strike Clients that falsely portrayed that
BLMIS had achieved the promised "returns" of approximately 10 to
17 percent per year.

22.   On a regular basis, Madoff provided guidance to
DiPascali and, through DiPascali, to other co-conspirators, about
the gains or losses that Madoff wanted to be reflected in the
account statements of the Split Strike Clients.   Based on that

guidance, DiPascali and other co-conspirators prepared model baskets of S&P 100 stocks based on historical market prices and tracked how those hypothetical baskets would have performed in the actual marketplace to determine whether and when to "enter the market." Whenever Madoff informed DiPascali that he had decided to "enter the market," DiPascali and other co-conspirators caused data related to the chosen basket of securities to be entered into a computer dedicated to the IA business, which was housed principally on the 17th floor of BLMIS's offices. That computer was referred to by certain BLMIS employees as "House 17." Madoff, DiPascali, and other co-conspirators used computer programs developed by JEROME O'HARA and GEORGE PEREZ, the defendants, to, among other things, allocate multiples of the chosen basket to Split Strike Clients on a pro rata basis based on each such client's purported account balance. When Madoff made a final decision purportedly to "enter the market," DiPascali and other co-conspirators would cause tens of thousands of false documents to be produced from data stored on House 17 that purported to confirm the purchases of securities that, in fact, had not been purchased.

23. The purported trades by which BLMIS supposedly "entered the market" were priced using data from market activity that already had occurred - sometimes one or more days prior to the date on which the decision to "enter the market" was

11

finalized.  Because none of the "trades" actually occurred, Madoff, DiPascali, and other co-conspirators relied on historical price and trading volume data obtained from published sources of market information.  With the benefit of hindsight, Madoff and DiPascali chose the prices at which securities purportedly were purchased in light of Madoff's objectives.  In doing so, Madoff, DiPascali, and other co-conspirators attempted to ensure that the trade confirmation slips sent to Split Strike Clients reflected prices that fell within the range of prices at which each such security in fact had traded on the pertinent day.

24.  A similar process to that described above was used in "exiting the market" by "selling out" of the purported stock and option positions and "buying" United States Treasury bills and shares in a money market fund with the "proceeds" of those purported sales.  With the benefit of hindsight, Madoff and DiPascali evaluated whether and when to appear to "sell out" of the securities positions that previously had been reported to Split Strike Clients.  Thereafter, DiPascali and other co-conspirators caused BLMIS employees to input fake data that generated tens of thousands of false confirmations of the purported transactions, which were subsequently printed and sent to Split Strike Clients through the United States mails.

25.  On a monthly basis, Madoff, DiPascali and other co-conspirators oversaw the production and mailing of thousands

of pages of account statements to Split Strike Clients.  Those

documents falsely reflected securities transactions that had not

been executed and securities positions that, in fact, did not

exist.

26.  In practice, the growth in account values reported

on the Split Strike Clients' account statements approximated the

annualized rates of return that had been targeted by Madoff.  As

directed by Madoff, DiPascali and other co-conspirators routinely

added additional fictitious options "trades" to the books and

records maintained on House 17 for certain Split Strike Client

accounts for the purpose of making it appear that those accounts

had achieved their respective targeted annual rates of return.

D.   **The Non-Split Strike Client Accounts**

27.  BLMIS had many IA Clients other than Split Strike

Clients (the "Non-Split Strike Clients").  As described more

fully below, the Non-Split Strike Clients were promised that

their investment funds would be used to buy and sell securities

in strategies that would realize annual returns in varying

amounts up to approximately 45 percent per year.  Madoff,

DiPascali, ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the

defendants, and others, took steps to make it appear that funds

from the Non-Split Strike Clients had been invested and generated

the returns they had been promised by Madoff when, in fact, they

had not.

E.   **BLMIS Operations and Computer Systems**

28.   BLMIS used numerous information technology systems in support of its Market Making, Proprietary Trading and IA businesses.   Madoff, DiPascali, DANIEL BONVENTRE, ANNETTE BONGIORNO, and JOANN CRUPI, a/k/a "Jodi," the defendants, and their co-conspirators relied upon computers operated by BLMIS employees, and computer programs developed and maintained by JEROME O'HARA and GEORGE PEREZ, the defendants, among others, to carry out and conceal the fraudulent scheme.

1.   **House 05: Market Making and Proprietary Trading**

29.   The operations of the Market Making and Proprietary Trading businesses were supported principally by two computer systems, among others: (1) a STRATUS trading platform; and (2) an IBM AS/400 server known internally at BLMIS (and referred to herein) as "House 05."[2]

a.   The STRATUS system was responsible for, among other things, effectuating the trading activities of BLMIS and, to that end, communicated with third parties, including trading contra parties.   The data generated through the STRATUS system about BLMIS trades (including, for example, dates, times, number

---

[2]      On or about April 30, 1993, BLMIS began using two IBM AS/400 servers (including House 05) at its offices at 885 Third Avenue, New York, New York, in connection with its Market Making, Proprietary Trading and IA businesses.

of shares, and stock symbols) were regularly transferred to House 05.

        b.   JEROME O'HARA and GEORGE PEREZ, the defendants, were familiar with the "back-end" processing on House 05 of the trades executed on behalf of the Market Making and Proprietary Trading businesses.  Among other things, these "back-end" programs processed data captured during the order entry and execution process by the STRATUS system to create various BLMIS books and records including, but not limited to, trading blotters and stock ledgers.  House 05 also had software that enabled communication with third parties including, but not limited to, the Depository Trust Company ("DTC"),[3] and obtained data from those third parties for use in creating BLMIS books and records. BLMIS employees regularly used the programs on House 05 to compare trading data received from the STRATUS system with information obtained from DTC and generated "break sheets" showing any discrepancies between BLMIS's information and DTC's data.

---

[3]    Among other things, DTC creates efficiencies in the clearing and settlement of securities transactions by retaining custody of securities on behalf of financial institutions and recording on its books and records changes in the ownership of those securities.  BLMIS had an account at DTC in which the securities of the Market Making and Proprietary Trading operations were custodied, as well as a few equity securities held on behalf of certain IA Clients.

c.   Both O'HARA and PEREZ were responsible for developing programs for, and maintaining, House 05.  O'HARA and PEREZ had direct knowledge of House 05, the BLMIS books and records created by House 05, the sources of data that House 05 incorporated into BLMIS's books and records, and the manner in which House 05 received information from third parties, including DTC.

2.   House 17:  The IA Business

30.   The operations of the IA business were supported by House 17, which was a separate IBM AS/400 server.  As JEROME O'HARA and GEORGE PEREZ, the defendants, knew, unlike House 05, House 17 did not receive trading data related to the IA business electronically from any computer that communicated with third parties, including trading contra parties.  Rather, Madoff, DiPascali, ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the defendants, and others involved in the IA business, created trading data related to the purported activities of the IA business and caused that data to be entered into the House 17 server.

31.   JEROME O'HARA and GEORGE PEREZ, the defendants, developed and maintained computer programs on House 17 (the "House 17 Programs") that were used to enter fake IA business trade data.  The House 17 Programs were used to generate, among other things, account statements, trade confirmations, trading

16